1   QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
2     Robert P. Feldman (Bar No. 69602)
      bobfeldman@quinnemanuel.com
3     Gabriel S. Gross (Bar No. 254672)
      gabegross@quinnemanuel.com
4     Michelle G. Lee (Bar No. 266167)
      michellelee@quinnemanuel.com
5     Dane W. Reinstedt (Bar No. 275447)
      danereinstedt@quinnemanuel.com
6   555 Twin Dolphin Drive, 5th Floor
    Redwood Shores, California  94065-2139
7   Telephone:     (650) 801-5000
    Facsimile:     (650) 801-5100
8
    Attorneys for Defendants Aliph, Inc. and
9   Aliphcom, Inc.

10

11                      UNITED STATES DISTRICT COURT

12                    NORTHERN DISTRICT OF CALIFORNIA

13                        SAN FRANCISCO DIVISION

14

15

16                                         CASE NO. 09-cv-01714-BZ

17   PLANTRONICS, INC.,                    ALIPH'S MOTION FOR (1) SUMMARY
                                           JUDGMENT OF NONINFRINGEMENT,
18                 Plaintiff,              (2) SUMMARY JUDGMENT OF
                                           INVALIDITY, AND (3) PARTIAL
19          v.                             SUMMARY JUDGMENT OF NO
                                           LIABILITY PRIOR TO ISSUANCE OF
20   ALIPH, INC. AND ALIPHCOM, INC.,       REEXAMINATION CERTIFICATE

21                 Defendants.             Date:        March 21, 2012
                                           Time:        10:00 a.m.
22                                         Courtroom:   C, 15th Floor
                                           Judge:       Hon. Bernard Zimmerman
23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ........................................................................................ vi

RELIEF REQUESTED ............................................................................................................... vi

STATEMENT OF ISSUES TO BE DECIDED .......................................................................... vi

MEMORANDUM OF POINTS AND AUTHORITIES .............................................................. 1

I.      INTRODUCTION ............................................................................................................ 1

II.     STATEMENT OF UNDISPUTED FACTS ..................................................................... 1

        A.      The '453 Patent and Relevant Prosecution History .............................................. 1

        B.      Aliph's Ergo and Spout Earbuds .......................................................................... 2

        C.      The Invalidating Prior Art .................................................................................... 2

III.    ARGUMENT .................................................................................................................... 3

        A.      Aliph is Entitled to Summary Judgment of Noninfringement ............................. 3

                1.      Aliph's Products Lack the Elongated "Stabilizer" of Claims 1 and
                        10. ............................................................................................................ 4

                2.      Aliph's Products Lack the "Stabilizers" "Dimensioned" as Required
                        by Claims 1 and 10. ................................................................................. 7

                3.      Aliph's Products Lack the "Receiver" "Sized" as Required by
                        Claims 1 and 10. ...................................................................................... 9

                4.      Aliph's Products Lack the "Stabilizer Pad" of Claims 1 and 11 ............. 10

                5.      Aliph's Products Lack the "Contact Points" of Claim 10. ...................... 12

                6.      Aliph's Products Lack A Stabilizer Comprising a Toroid or With a
                        Portion That is Torus Shaped. ................................................................ 13

        B.      Aliph is Entitled to Partial Summary Judgment of Invalidity Over the Prior
                Art ....................................................................................................................... 13

                1.      Claims 1, 7, 10, 11, 18, 20, 21, 26, 28, 30, 43, and 44 Are
                        Anticipated by Lieber. ............................................................................ 13

                2.      Claims 1, 7, 10, 11, 18, 20, 21, 26, 28, 30, 43, and 44 Are Made
                        Obvious by Lieber Alone, or by Komoda and Lieber. ............................ 17

                3.      All of the Asserted Claims Are Made Obvious by Komoda, Lieber,
                        and Geers. ............................................................................................... 22

C.    Aliph Is Entitled to Partial Summary Judgment of No Liability Before the Reexamination Certificate Issued............................................................ 24

IV.    CONCLUSION ............................................................................................. 25

ALIPH'S MOTION FOR SUMMARY JUDGMENT

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Adv. Tech. Material, Inc. v. Praxair, Inc.,*
  228 Fed. Appx. 983 (Fed. Cir. 2007) .................................................................24

*Arthur A. Collins, Inc. v. N. Telecom Ltd.,*
  216 F.3d 1042 (Fed. Cir. 2000) ..........................................................................6

*Bloom Eng'g, Co., Inc. v. North Am. Mfg. Co., Inc.,*
  129 F.3d 1247 (Fed. Cir. 1997) .....................................................................24, 25

*Boston Scientific Scimed, Inc. v. Cordis Corp.,*
  554 F.3d 982 (Fed. Cir. 2009) ...........................................................................20

*Chef America, Inc. v. Lamb-Weston, Inc.,*
  358 F.3d 1371 (Fed. Cir. 2004) ..........................................................................13

*Dow Chem. Co. v. Halliburton Oil Well Cementing Co.,*
  324 U.S. 320 (1945) ..........................................................................................17

*Dystar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.,*
  464 F.3d 1356 (Fed. Cir. 2006) ..........................................................................21

*Eolas Techs. Inc. v. Microsoft Corp.,*
  399 F.3d 1325 (Fed. Cir. 2005) ..........................................................................17

*Graham v. John Deere Co.,*
  383 U.S. 1 (1966) ..............................................................................................17

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,*
  381 F.3d 1111 (Fed. Cir. 2004) ..........................................................................11

*KSR Int'l Co. v. Teleflex, Inc.,*
  550 U.S. 398 (2007) ................................................................................... *passim*

*Karlin Tech., Inc. v. Surgical Dynamics, Inc.,*
  177 F.3d 968 (Fed. Cir. 1999) ............................................................................11

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.,*
  485 F.3d 1157 (Fed. Cir. 2007) ..........................................................................17

*Liquid Dynamics Corp. v. Vaughan Co., Inc.,*
  449 F.3d 1209 (Fed. Cir. 2006) ...........................................................................5

*MShift, Inc. v. Digital Insight Corp.,*
  747 F. Supp. 2d 1147 (N.D. Cal. 2010) ...............................................................7

*Mark Indus. v. Mobile Scaffolding Mgmt. & Sales Inc.,*
  No. 87-06193, 1989 WL 418793 (C.D. Cal. Sept. 12, 1989)............................7, 11

*Mas-Hamilton Group v. LaGard, Inc.*,
   156 F.3d 1206 (Fed. Cir. 1998) ........................................................................................3

*Novo Nordisk Pharms., Inc. v. Bio-Tech. Gen. Corp.*,
   424 F.3d 1347 (Fed. Cir. 2005) ......................................................................................13

*Pharmastem Therapeutics, Inc. v. ViaCell, Inc.*,
   491 F.3d 1342 (Fed. Cir. 2007) ......................................................................................14

*Princeton Biochems., Inc. v. Beckman Coulter, Inc.*,
   411 F.3d 1332 (Fed. Cir. 2005) ......................................................................................18

*Southwall Techs., Inc. v. Cardinal IG Co.*,
   54 F.3d 1570 (Fed. Cir. 1995) ...................................................................................10, 12

*Sundance, Inc. v DeMonte Fabricating Ltd.*,
   550 F.3d 1356 (Fed. Cir. 2008) ......................................................................................22

*TechSearch L.L.C. v. Intel Corp.*,
   286 F.3d 1360 (Fed. Cir. 2002) ........................................................................................3

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
   247 F.3d 1316 (Fed. Cir. 2001) ......................................................................................13

*Union Carbide Corp. v. Am. Can Co.*,
   724 F.2d 1567 (Fed. Cir. 1984) ......................................................................................24

*Univ. of Va. Patent Found. v. General Elec. Co.*,
   755 F. Supp. 2d 709 (W.D. Va. 2010) ...........................................................................25

## **Statutes**

35 U.S.C. § 102 (2006) ..............................................................................................................13

35 U.S.C. § 103 (2006) ..............................................................................................................17

35 U.S.C. § 307(b) (2006) ..........................................................................................................24

1

<u>EXPLANATION OF CITATION FORMS</u>

2

3

Citations to "JSUF" are citations to the Joint Statement of Undisputed Facts filed concurrently with this Motion.

4

Citations to "DSUF" are citations to the Defendants' Statement of Undisputed Facts filed concurrently with this motion.

5

6

Citations to "Ex." are citations to exhibits to the Declaration of Dane Reinstedt in Support of Aliph's Motion for Summary Judgment, submitted herewith.

7

8

Citations to "Lieu Decl." are citations to the Declaration of Dennis K. Lieu, Ph.D. in Support of Aliph's Motion for Summary Judgment, submitted herewith.

9

10

Citations to "Asseily Decl." are citations to the Declaration of Alexander Asseily in Support of Aliph's Motion for Summary Judgment, submitted herewith.

11

Citations to "Ambrose Decl." are citations to the Declaration of Stephen Ambrose in Support of Aliph's Motion for Summary Judgment, submitted herewith.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on March 21, 2012 at 10:00 a.m., or as soon thereafter as counsel may be heard before the Honorable Bernard Zimmerman in Courtroom C at 450 Golden Gate Avenue, San Francisco, California, Defendants Aliph, Inc. and Aliphcom, Inc. will, and hereby do, move this Court for summary judgment that they do not infringe and have not infringed U.S. Patent No. 5,712,453; summary judgment of invalidity of the '453 patent; and partial summary judgment of no liability prior to the March 1, 2011 issuance of the reexamination certificate. Aliph's motion is based on this notice, the memorandum of points and authorities that follows, the pleadings on file in this action, and any further evidence or argument that the Court may properly receive at or before the hearing.

RELIEF REQUESTED

Pursuant to Federal Rule of Civil Procedure 56, Aliph requests from the Court an order granting summary judgment that it does not infringe and has not infringed the '453 patent; summary judgment of invalidity of the '453 patent; and partial summary judgment of no liability prior to the March 1, 2011 issuance of the reexamination certificate.

STATEMENT OF ISSUES TO BE DECIDED

1.      Whether Aliph is entitled to summary judgment of noninfringement of the '453 patent because:

    (a)      the accused products lack elongated stabilizers as required by claims 1 and 10;

    (b)      the accused products lack stabilizers dimensioned as required by claims 1 and 10;

    (c)      the accused products lack receivers sized as required by claims 1 and 10;

    (d)      the accused products lack the stabilizer pad required by claims 1 and 11;

    (e)      the accused products lack the contact points required by claim 10;

    (f)      the accused products lack the torus or toroid shaped stabilizers of claims 29, 34-35, 47, and 53.

2.      Whether Aliph is entitled to summary judgment of invalidity of the '453 patent under 35 U.S.C. §§ 102 and 103 because:

(a)    claims 1, 7, 10, 11, 18, 20, 21, 26, 28, 30, 43, and 44 are anticipated by the prior art (Lieber);

(b)    claims 1, 7, 10, 11, 18, 20, 21, 26, 28, 30, 43, and 44 are made obvious by the prior art (Lieber alone and with Komoda); and

(c)    all of the asserted claims are made obvious by the prior art (Komoda, Lieber, and Geers).

3.    Whether Aliph is entitled to partial summary judgment of no liability for allegedly infringing any claim added during reexamination, before the reexamination certificate issued on March 1, 2011, because those claims did not exist before that date.

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

I.      <u>INTRODUCTION</u>

On the undisputed record, Aliph is entitled to summary judgment of noninfringement and invalidity of every asserted claim, and to partial summary judgment of no liability before March 1, 2011.  First, the undisputed facts show that Aliph's products lack several essential requirements of, and thus cannot infringe, any claim of the '453 patent.  The Court has construed the claims and there is no dispute about the physical form or dimensions of Aliph's products, leaving no infringement issue for a jury to decide.  Second, Plantronics cannot avoid the invalidating prior art that has been known and available for decades.  The undisputed disclosures of the prior art anticipate and render all the asserted claims obvious.  Third, the new claims added during reexamination cannot as a matter of law create liability prior to the issuance of the reexamination certificate, since the original asserted claims are invalid.

II.     <u>STATEMENT OF UNDISPUTED FACTS</u>

A.      <u>The '453 Patent and Relevant Prosecution History</u>

The '453 patent was applied for on April 28, 1994 and issued on January 27, 1998.  (JSUF No. 1.)  Original claims 1, 7, 10 and 11 that Plantronics asserts against Aliph generally require four basic elements: (1) a "<u>receiver</u>" of a particular size, (2) an "<u>ear cushion</u>," (3) a "<u>stabilizer</u>" extending to the upper concha, and, for certain claims, (4) a "<u>pad</u>" coupled to the stabilizer.  (Ex. 1, claims 1, 7, 10, 11.)  Independent claim 1 is representative:

> 1.  An apparatus for stabilizing a headset including a **receiver** sized to fit between a tragus and an anti-tragus of an ear, the apparatus comprising:
>
> an **ear cushion** dimensioned to cover a portion of the receiver disposed between the tragus and the anti-tragus;
>
> a resilient and flexible **stabilizer** support member coupled to the ear cushion, and dimensioned to fit within an upper concha with the ear cushion coupled to the receiver and the receiver disposed between the tragus and the anti-tragus; and,
>
> a concha stabilizer **pad** coupled to the stabilizer support member, for contacting the upper concha.

On March 1, 2011, the Patent Office issued a reexamination certificate that added new dependent claims 16-56.  (JSUF No. 50; Ex. 2.)  These new claims added limitations primarily directed to the materials and shapes of various features in the original claims.  (DSUF Nos. 47-48.)  None of the

1  new claims is identical to any original claim of the '453 patent.  (JSUF No. 52; *see also* DSUF No.

2  49.)

3         B.    <u>Aliph's Ergo and Spout Earbuds</u>

4         Plantronics has accused Aliph's "Ergo" and

5  "Spout" earbuds and the headsets on which they are used

6  of infringing the '453 patent.  (JSUF No. 53; *see also*

7  DSUF No. 1.)  The two accused earbuds are depicted

8  here, with the Spout earbud at left and Ergo earbud at



9  right.  There is no dispute about the shape, size, or dimensions of these earbuds.  The undisputed

10  technical details are described in engineering drawings and the declaration of Aliph's

11  noninfringement expert, Dennis Lieu, a Professor of Mechanical Engineering at the University of

12  California, Berkeley.  (JSUF Nos. 5-16, 18-19; Lieu Decl. ¶¶ 6-8; Ex. 9.)  Two key features of the

13  earbuds are (1) the roughly circular portion that covers the receiver on Aliph's headsets, and

14  (2) the U-shaped or "horseshoe"-shaped extension intended to engage the lower bowl-shaped

15  portion of the ear—the lower concha.  (DSUF Nos. 3, 6.)   The U-shaped extension on Aliph's

16  earbuds is a single, unitary piece of material with no distinguishing features that indicate distinct

17  component parts.  (JSUF No. 11; DSUF No. 9.)  For every accused earbud, in every size available,

18  this extension is wider than it is long.  (JSUF Nos. 5-10; DSUF Nos. 7-8.)  The U-shaped

19  extension is made to achieve the intended purpose of engaging the lower or rear part of the

20  concha.  (DSUF Nos. 22-23; Asseily Decl. ¶ 3.)  Aliph's headsets, with which the earbuds are

21  used, have a rigid plastic receiver—that is, "a structure on a headset from which sound is

22  transmitted"—that rests in the ear, facing the ear canal, behind the tragus and antitragus.  (JSUF

23  No. 3; D.N. 99 at 2; DSUF No. 2.)  The circumference of the receiver is encased by the silicone

24  rubber of the earbud to prevent it from making direct contact with the ear.  (JSUF No. 12; DSUF

25  Nos. 3-5.)

26         C.    <u>The Invalidating Prior Art</u>

27         Devices that fit within and engage the anatomy of the ear for support and stability have

28  been around since as early as the 1920s.  (JSUF No. 20.)  By the time the '453 patent was applied

1   for in 1994, a person of ordinary skill in the art understood that a wide variety of stabilizer

2   structures could be used to support an in-the-ear device.  (JSUF No. 22.)  As Plantronics has

3   noted, by the time the '453 patent was applied for, "structures contacting the upper concha could

4   include the half-a-loop structure of U.S. Patent No. 1,614,987, the z-shaped structure of U.S.

5   Patent No. 1,668,910, the circular and pole shaped structure of U.S. Patent No. 1,893,143, and the

6   horn-shaped structure of U.S. Patent No. 1,753,817."  (D.N. 127 at 1.)  By 1994, circular ear

7   cushions were also well known in the art.  (JSUF No. 23.)  Those in the field had been working for

8   decades developing ways to achieve comfortable fit for devices that engage the limited number of

9   anatomical features in the ear.  (JSUF Nos. 21, 25.)

10          U.S. Patent No. 1,893,474 ("Lieber") issued to Hugo Lieber in 1933 and thus constitutes

11   prior art.  (Ex. 3; JSUF No. 27.)  Lieber discloses (1) a receiver, (2) an ear cushion, (3) a stabilizer

12   member that is dimensioned to engage the upper concha, and (4) a pad coupled to the stabilizer

13   member.  (JSUF No. 28; DSUF Nos. 33-36.)  Japanese Utility Patent Application No. 60-

14   40187(U) ("Komoda") was published in 1985 and thus constitutes prior art.  (Ex. 4; JSUF No. 30.)

15   Komoda discloses (1) a receiver, (2) an ear cushion, (3) a stabilizer member that is dimensioned to

16   engage the upper concha, and (4) a pad coupled to the stabilizer member.  (JSUF Nos. 31-33;

17   DSUF Nos. 43, 45.).  U.S. Patent No. 5,048,090 ("Geers") was published more than one year prior

18   to the date of Plantronics' application for the '453 patent, constitutes prior art to the '453 patent,

19   and discloses an in-the-ear device with hoop-shaped stabilizing features.  (Ex. 5; JSUF No. 29;

20   DSUF No. 42.)

21   III.     ARGUMENT

22          A.      Aliph is Entitled to Summary Judgment of Noninfringement

23          "To establish literal infringement, all of the elements of the claim, as correctly construed,

24   must be present in the accused system."  *TechSearch L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1371

25   (Fed. Cir. 2002).  If even a single claim limitation is not present in a device, there can be no literal

26   infringement.  *See Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998).

27   For the following five reasons, Aliph's products lack crucial elements of the claims of the '453

28   patent and thus cannot infringe.  The only two independent claims are claims 1 and 10:

| Claim 1 | Claim 10 |
|---|---|
| 1. An apparatus for stabilizing a headset including a receiver sized to fit between a tragus and an anti-tragus of an ear, the apparatus comprising: | 10. A headset comprising |
| | a receiver sized to fit between a tragus and an antitragus of an ear, the receiver having a tragus contact point, and an anti-tragus contact point disposed substantially opposite to the tragus contact point; |
| an ear cushion dimensioned to cover a portion of the receiver disposed between the tragus and the anti-tragus; | an ear cushion dimensioned to cover a portion of the receiver; and |
| a resilient and flexible stabilizer support member coupled to the ear cushion, and dimensioned to fit within an upper concha with the ear cushion coupled to the receiver and the receiver disposed between the tragus and the anti-tragus; and, | a concha stabilizer coupled to the ear cushion and dimensioned to contact an upper concha between an antihelix and a crux of a helix with the receiver disposed between the tragus and the antitragus. |
| a concha stabilizer pad coupled to the stabilizer support member, for contacting the upper concha. | |

### 1. Aliph's Products Lack the Elongated "Stabilizer" of Claims 1 and 10.

Aliph's accused products have neither the "stabilizer support" of claim 1 nor the "concha stabilizer" of claim 10 and thus cannot infringe. The Court has construed both "stabilizer" terms: (1) a "stabilizer support" is "an elongated structure that extends from the ear cushion to the concha stabilizer pad and stabilizes the headset," and (2) a "concha stabilizer" is "an elongated stabilizing structure, which extends between the ear cushion and the upper concha." Both terms require an "elongated structure." (D.N. 134 at 1; D.N. 142 at 8-9.) For a structure to be elongated it must be longer than it is wide. (Lieu Decl. ¶ 4; Ex. 6 at 103:20-104:1) But it is undisputed that the width of the U-shaped extension on Aliph's earbuds is significantly greater than its length. (JSUF Nos. 5-10; DSUF Nos. 7-8.) The U-shaped extension of the small Ergo earbud, which is representative, is 20% wider (12.80 mm) than it is long (10.68 mm)—unlike the claimed invention's elongated stabilizer. As Professor Lieu explains, the undisputed dimensions of every size of the Ergo and Spout earbuds confirm that the width of the U-shaped extension is greater than its length, and not elongated. (Lieu Decl. ¶¶ 6-8; JSUF Nos. 5-10.) Without the elongated "stabilizer," Aliph cannot infringe the '453 patent.

Plantronics and its expert witness on infringement, Barry Katz,[1] try to adjust the Court's construction of the claim by selectively seizing on a comment made during the hearing to advance a new construction, that "elongated" means nothing more than "extending upward," regardless of shape.  (*See* Ex. 6, at 99:5-100:6; *see also* Ex. 7, at, e.g., 6-7.)  Setting aside Plantronics' misinterpretation of the record, it is the Court's <u>order</u>, not its colloquy with counsel, that establishes a claim construction.  The Court already rejected Plantronics' argument that the claimed stabilizer is not elongated.  (D.N. 142 at 8-9)  Plantronics may not now ignore the Court's construction in a second attempt to win a point it has already lost.  *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1224 n.2 (Fed. Cir. 2006) (affirming exclusion of expert testimony based on incorrect claim construction).

Further, Mr. Katz's use of "elongated" to mean <u>only</u> "extending upward" (Ex. 6 at 99:5-100:6) or "that the structure that [*sic*] extends from the ear cushion to the upper concha" (Ex. 7, at, e.g., 6-7) is nonsensical.  The claim construction order expressly states that the concha stabilizer is "an <u>elongated</u> stabilizing structure, which <u>extends between the ear cushion and the upper concha</u>." (D.N. 142 at 9.)  Applying "elongated" to mean "that the structure extends from the ear cushion to the upper concha" (Ex. 7, at 6-7), would thus render the latter half of the Court's construction redundant and meaningless (i.e., "a structure that extends from the ear cushion to the upper concha, which extends from the ear cushion to the upper concha").  (*See* Ex. 6, at 102:19-103:17.) The plain English word "elongated" connotes something longer than it is wide.  (Lieu Decl. ¶ 4.) No dictionary defines "elongated" as simply "extending upward," or Plantronics surely would rely on one.  Even Mr. Katz acknowledged that the conventional use of "elongated" to refer to

---

[1]  Mr. Katz's opinions and testimony fail to establish genuine issues of fact sufficient to defeat summary judgment of noninfringement, as Aliph explains herein.  Separately, Aliph will move the Court to exclude Mr. Katz's opinions under *Daubert* and Rules 403 and 702, including because his humanities background makes him unqualified to opine on the technology of the '453 patent.  This summary judgment motion presumes the admissibility of Mr. Katz's opinions and testimony. However, should the Court exclude that evidence, summary judgment would be appropriate for the additional reason that Plantronics would have nothing with which it could rebut Aliph's evidence of noninfringement, including Professor Lieu's competent opinions.

1    something longer than it is wide is reasonable and common.  (Ex. 6, at 103:20-104:1.[2])

2          Plantronics, through Mr. Katz, also argues, in another attempt to circumvent the Court's

3    construction, that Aliph's products have "elongated" extensions by arbitrarily dividing the U-

4    shaped extension into two or three arc-shaped parts, which individually, it argues, are elongated.

5    These contortions are belied by the undisputed facts.  Aliph's U-shaped extension is a single,

6    unitary piece of material with no distinguishing physical features that indicate any distinct,

7    elongated parts.  (JSUF No. 11; DSUF No. 9.)  Yet Mr. Katz points to two areas of this unitary

8    piece—regions he admits are "difficult to impossible to specify in a precise and quantitative

9    fashion"—and arbitrarily concludes they are the elongated stabilizers required by claims 1 and 10.

10   (*See* Ex. 7, at, e.g., 4-7; Ex. 6, at 181:18-23.)  Mr. Katz's conclusory and unsupported opinion

11   cannot create a genuine issue of material fact.  *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d

12   1042, 1046 (Fed. Cir. 2000) (noting that a party cannot raise a genuine issue of material fact based

13   upon an expert's unsupported conclusion by "simply framing the expert's conclusion as an

14   assertion that a particular critical claim limitation is found in the accused device").

15         Tellingly, Mr. Katz had to abandon the flawed theory that the U-shaped extension has

16   elongated stabilizers on "the sides of the horseshoe" in order to support Plantronics' other

17   infringement positions.  (Ex. 6, at 112:13-113:25, 238:13-240:16.)  Many dependent claims

18   require the "concha stabilizer" of claim 10 to also be circular: "ring shaped," "torus shaped," with

19   an "opening" or a "vacant center."  Contradicting his opinion that the "concha stabilizer"

20   requirement of claim 10 is met by just the <u>sides</u> of Aliph's "horseshoe," Mr. Katz also concludes

21   that the same limitation is satisfied by "the <u>entire</u> horseshoe shape" for purposes of these

22   dependent claims.  (*See* Ex. 6, at 112:24-113:25; 238:13-240:16.)  Mr. Katz admits to this

23   inconsistency:

24         Q.  … The sides of the horseshoe that you have identified as concha stabilizers in
           the photograph are not ring shaped, are they?  A.  The sides are not, no.  Q.  Only
25

26   ───────────────────
         [2]  "Q.  You've heard the word 'elongated' used to refer to something that's longer than it is
27   wide, haven't you?  A.  Yes.  Q.  You don't think that's an unreasonable or unusual use of the
     term, do you?  A.  I don't think it's unreasonable, no."
28

the entire horseshoe shape is what can be considered even roughly ring shaped?  A. Yes.  Q.  So your definition of 'concha stabilizer' changes depending on which claim you are analyzing; correct?  A.  It allows for two possibilities, yes.

(Ex. 6, at 113:15-25.)  An expert's internally irreconcilable positions fail to create a genuine fact dispute.  *See, e.g.*, *MShift, Inc. v. Digital Insight Corp.*, 747 F. Supp. 2d 1147, 1170 n.11 (N.D. Cal. 2010) (finding internally inconsistent expert opinion fails to create a genuine issue of material fact).  Mr. Katz's internal inconsistency only underscores the propriety of the Court's construing "concha stabilizer" precisely, to provide adequate notice to the public of the scope of the claims.  *See Mark Indus. v. Mobile Scaffolding Mgmt. & Sales Inc.*, No. 87-06193, 1989 WL 418793, at *19 (C.D. Cal. Sept. 12, 1989) ("This confusion on the part of the plaintiff's own expert on how to apply the claim language indicates a clear need for a very limited interpretation of the claim in order not to confuse the public as to the metes and bounds of the invention.").

Nothing about the physical form of Aliph's earbuds is in dispute, no matter how Mr. Katz's tries to characterize of those products or reshape the claim constructions.  The undisputed fact is that Aliph's earbuds lack an elongated stabilizer and cannot infringe either of the independent claims 1 or 10, or any other claim of the '453 patent.

### 2.    Aliph's Products Lack the "Stabilizers" "Dimensioned" as Required by Claims 1 and 10.

Aliph's accused products do not have a stabilizer "dimensioned to fit within an upper concha" as required by claim 1 or "dimensioned to contact an upper concha" as required by claim 10.  The Court addressed these terms, and ascribed to them their plain meanings.  (D.N. 142 at 2-3.)  Plantronics and its experts, Mr. Katz and Mr. Kreiner, consider something "dimensioned to fit within an upper concha" as made to achieve the intended purpose of fitting within the upper concha.  (DSUF No. 24.)  Similarly, they conclude a structure "dimensioned to contact an upper concha" is made to achieve the intended purpose of contacting the upper concha.  (DSUF No. 25.)  Aliph agrees with the plain meanings of these terms; there is no genuine dispute on these points.

The U-shaped extension on Aliph's products, however, is not made to achieve the intended purpose of engaging the upper concha.  Rather, it is intended to fit within or contact the lower, rear part of the concha.  (DSUF Nos. 22-23; Asseily Decl. ¶ 3.)  The "upper concha" is "a depression

in a human ear that lies above the crux of the helix and below the antihelix as illustrated by example in Figure 3 of the '453 patent."  (D.N. 99 at 2.)



The broad, flat U-shape of the extension on Aliph's earbuds is not dimensioned to fit within or contact the small depression in the ear that is the upper concha.  (Lieu Decl. ¶ 9.)  Aliph's products use a larger, broader U-shaped extension meant to "conform to the shape of the rear concha"— itself a broad, rounded, bowl-like structure.  (Ex. 8, at 192:8-23.)

Firsthand testimony explains how Aliph's extension was designed and its intended purpose, and is undisputed.  Mr. Asseily, an engineer and co-founder of Aliph, testified:

> **[O]ur objective** was to contribute some of the same forces to the headset that the ear loop had been providing, which is a rotational force along a horizontal axis so that … **the squat ring that emerged out of the back of the earbud** was traveling along a horizontal axis to the **rear of the concha**, so that when it applied an inward force effectively **against the lower concha**, that that in turn created a rotational force into the cheek and against the cheek and against the ear for the rest of the headset.

(Ex. 8, at 191:10-25 (emphasis added).)  Professor Lieu has confirmed that the functional goal Mr. Asseily described, of creating rotational force (necessary to drive a sensor in the headset against a user's cheek), is achieved through an earbud intended to engage and press against the lower concha.  (Lieu Decl. Ex. 1, at, e.g., ¶ 51.)  This positioning of the earbud is an important component to the functioning and overall position of the headset, with the boom contacting the cheek and pointing toward the mouth to efficiently pick up a user's speech.  (Asseily Decl. ¶¶ 3-6.)  Plantronics' expert, Mr. Katz, did not rebut this or explain any functional reasons why Aliph's earbuds are not designed and intended to engage the lower concha.  (*See* Ex. 7, at 4-14.)

As Professor Lieu explains, still other features of Aliph's accused earbuds (including the

"ear channel spout" and "raised nub" at the bottom of the earbuds) objectively demonstrate that the U-shaped extension is not made to engage the upper concha.  (Lieu Decl. ¶ 10-13, Ex. 1, at ¶ 48-49; JSUF Nos. 13-14; DSUF Nos. 15-20.)  To the contrary, physically forcing Aliph's earbuds into an incorrect position where the U-shaped extension touches the upper concha renders the earbuds neither functional nor comfortable.  (Lieu Decl. ¶ 12, Ex. 1, ¶¶ 48-49; Asseily Decl. ¶ 6.)  When the U-shaped extension is properly positioned in the lower concha, as intended, the earbud functions to channel sound into the ear channel and fits securely in the ear.  (Lieu Decl. ¶ 13, Ex. 1, ¶¶ 48-49.)  Plantronics' expert, Mr. Katz, had no opinion to rebut this undisputed evidence.  (Ex. 6, at 192:8-193:13; Ex. 7, at 4-14.)  Accordingly, Aliph does not infringe any claim of the '453 patent because its products lack stabilizers "dimensioned" as required by claims 1 and 10.

       3.   <u>Aliph's Products Lack the "Receiver" "Sized" as Required by Claims 1 and 10.</u>

Aliph's accused products do not literally include "a receiver sized to fit <u>between</u> a tragus and an anti-tragus of an ear" or a "receiver disposed <u>between</u> the tragus and the anti-tragus" as required by claims 1 and 10.  The parties have agreed on the meanings of "tragus" and "antitragus" which are illustrated by example in Figure 3 of the '453 patent, below.  (*See also* D.N. 99 at 2.)  The figures and specification of the '453 patent depict an exemplary receiver as element 27, which the parties agree is "the structure on the headset from which sound is transmitted."  *Id*.



FIGURE 1B

FIGURE 3

Connecting the receiver 27 to the "voice tube" 30, or body of the headset, is a stem (highlighted in figure 1B above and marked with an arrow in the picture of Aliph's product

1   below).  In Aliph's products, the receiver sits <u>behind</u> the tragus and antitragus in the bowl of the

2   concha, in front of the ear channel.  (JSUF No. 3; DSUF No. 2.)  Only the stem of the headset (not

3   the receiver) may fit between the tragus and antitragus.  As Plantronics' expert Mr. Katz admits,

4   the "Jawbone receivers rest <u>behind</u> the tragus and antitragus, facing the ear canal" and the "stem of

5   Aliph's Jawbone headsets" "would rest in the intertragic notch."  (Ex. 6, at 141:5-18.)



(Lieu Decl. Ex. 1, ¶ 54.)

12       "To establish literal infringement, every limitation set forth in a claim must be found in an

13   accused product, <u>exactly</u>."  *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1574 (Fed.

14   Cir. 1995) (emphasis added).  Claims 1 and 10 of the '453 patent literally require the <u>receiver</u> be

15   "sized to fit <u>between</u> a tragus and an anti-tragus of an ear" and that "the <u>receiver</u> [be] disposed

16   <u>between</u> the tragus and the anti-tragus."  (Ex. 1, claims 1, 10.)  Neither of these requirements is

17   literally satisfied by Aliph's products.  Aliph cannot infringe claim 1 or 10 for this reason.

18              4.      Aliph's Products Lack the "Stabilizer Pad" of Claims 1 and 11

19       Aliph's accused products also do not have a "concha stabilizer pad" and thus cannot

20   infringe claims 1 or 11.  Claims 1 and 11 require both a "stabilizer support" <u>and</u> a "concha

21   stabilizer pad" coupled to it.  (Ex. 1, claims 1, 11.)  The Court has construed "concha stabilizer

22   pad" to mean "a soft structure that protects the upper concha."  (D.N. 142 at 5.)  The Court noted

23   that "[w]hether the 'concha stabilizer pad' and the 'stabilizer support' are two discrete structures is

24   an argument more appropriate for summary judgment."  (*Id*.)

25       The claim language dictates that the "concha stabilizer pad" and "stabilizer support" are

26   different things.  The relevant part of claim 1 requires:  (a) "a resilient and flexible stabilizer

27   support member" and (b) "a concha stabilizer pad coupled to the stabilizer support member."  (Ex.

28   1, claim 1.)  By contrast, claim 10 includes a "concha stabilizer," but does not require a "concha

1    stabilizer pad."  The "pad" is its own distinct limitation.  (Ex. 1, claims 10, 11.)

2           As a matter of law, the "concha stabilizer pad" of claim 11 must be something different

3    than the "concha stabilizer" of claim 10.  *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d

4    968, 971-72 (Fed. Cir. 1999) ("[D]ifferent words or phrases used in separate claims are presumed

5    to indicate that the claims have different meanings and scope.").  Plantronics' position—that no

6    distinct structure is required to have a pad—would eviscerate the requirement of a "concha

7    stabilizer pad" in claims 1 and 11.  Plantronics' view would permit the same soft structure to be

8    both a stabilizer <u>without</u> a pad, and a stabilizer <u>with</u> a pad.  This tortured view of the claims,

9    essential to Plantronics' infringement theory, would render the "concha stabilizer pad" limitation

10   "superfluous" and is contrary to well-established rules of claim interpretation.  *Innova/Pure Water,*

11   *Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004).

12          Aliph's accused products have a continuous U-shaped extension—a single, unitary piece

13   of material with no distinguishing physical features to indicate a "pad."  (JSUF No. 11; *see also*

14   DSUF No. 9.)   Mr. Katz fails to identify a specific feature that he can identify as the concha

15   stabilizer pad.  Instead, according to Mr. Katz, the form and location of the "pad" changes

16   depending on how the earbud is positioned in an ear.  (Ex. 6, at 155:4-156:9.)  Thus, according to

17   Plantronics and Mr. Katz, the alleged "pad" on Aliph's earbuds may be located at the 12 o'clock

18   position, or at 10 o'clock, or at 2 o'clock, or at some other unknown location depending on who

19   was using it and how.  (*Id.* at 155:4-156:9.)  Under Plantronics' theory, when the earbud is

20   removed from a user's ear, Mr. Katz "wouldn't be able to" determine where the pad is located at

21   all.  (*Id.* at 156:3-17.)  Mr. Katz's opinion rests on a legally untenable and ever-changing claim

22   interpretation of the "pad" element, one that would never provide the public with adequate notice

23   of what does or does not infringe the patent.  *See Mark Indus.*, 1989 WL 418793, at *19.  The

24   Court already has construed "concha stabilizer pad," and there is no dispute about the physical

25   form of Aliph's products.  (JSUF Nos. 5-16, 18-19.)  The undisputed record confirms that Aliph's

26   earbuds lack the "stabilizer pad" required by claims 1 and 11, and cannot infringe either claim or

27   any depending from them.

28

1

### 5.   Aliph's Products Lack the "Contact Points" of Claim 10.

2      Aliph's accused products also do not have a receiver with "a tragus contact point, and an

3   anti-tragus contact point" and cannot infringe claim 10.  Aliph's earbuds encase the receiver so

4   that only the earbud—not the receiver—actually contacts the tragus and anti-tragus.  As Mr. Katz

5   admits, in Aliph's products, "there is no actual contact between the receiver itself and a user's

6   ear." (Ex. 6, at 87:4-6.)  This is because the earbuds surround the receiver with a layer of silicone

7   rubber that prevents contact with the ear, as shown below (with the portion that encases the

8   receiver highlighted in yellow).  (DSUF Nos. 3-5; Ex. 9, at 1.)

9

10

11   

12

13      Though Mr. Katz assumes that "[t]he receiver does not have to directly touch the tragus

14   and antitragus in order to contact those parts of the ear," he provides no facts or explanation of

15   how Aliph's products actually satisfy the literal "contact point" limitations of claim 10, and fails

16   to create a genuine fact dispute.  (Ex. 7, at 4.)  Nor has Plantronics presented evidence of

17   infringement under the doctrine of equivalents.  (DSUF No. 28.)  The Court declined to construe

18   the term "contact" as requiring "direct contact," but it nonetheless observed that this issue was

19   "more appropriate for an infringement analysis."  (D.N. 142 at 8.)

20      The Court construed the "contact points" limitation to mean "the receiver having two

21   points, substantially opposite to one another, that contact the tragus and the antitragus."  (D.N. 142

22   at 8.)  A "receiver" having points that "contact the tragus and the antitragus" is exactly the

23   opposite of Aliph's products, in which only the earbud, and never the receiver, contacts the ear.

24   Literal infringement requires proof that every element of a claim is satisfied, "exactly."

25   *Southwall*, 54 F.3d at 1574.  Plantronics cannot show that Aliph meets this limitation, exactly.

26   While Plantronics may regret drafting a claim to require literal contact between a "receiver,"

27   "tragus," and "anti-tragus," it cannot ask the Court to re-write it.  *See Chef America, Inc. v. Lamb-*

28

*Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("[W]e construe the claim as written, not as the patentees wish they had written it ….").  Aliph does not infringe claim 10 or any claim depending from it.

      6.      <u>Aliph's Products Lack A Stabilizer Comprising a Toroid or With a Portion That is Torus Shaped.</u>

      Aliph's accused products do not have a concha stabilizer that "comprises" a "toroid" or "torus" or with "a portion" that is "torus shaped" as called for in asserted claims 29, 35, 36, 47, and 53.[3]  The Court construed "torus" and "toroid" in these claims to mean "a doughnut-shaped body or surface generated by <u>a circle rotated about an axis</u>."  (D.N. 134 at 2.)  The U-shaped extension on Aliph's earbuds is not a literal torus or toroid.  (JSUF No. 15.)  The extension does not have a cross-section that is a circle.  (JSUF No. 16.)  Nor has Plantronics shown otherwise— Mr. Katz offered no opinion that Aliph's products infringed these claims, and conceded at his deposition that they did not.  (JSUF Nos. 26-28; Ex. 7, at 4-14; Ex. 6, at 210:14-211:8.[4])

     B.      <u>Aliph is Entitled to Partial Summary Judgment of Invalidity Over the Prior Art.</u>

      While the Court can and should render summary judgment on noninfringement, independently the patent is also invalid.  The prior art invalidates the '453 patent for the reasons below.  <u>Appendix A</u> to this brief provides a summary chart of which claims are anticipated and rendered obvious by the prior art references addressed here.

      1.      <u>Claims 1, 7, 10, 11, 18, 20, 21, 26, 28, 30, 43, and 44 Are Anticipated by Lieber.</u>

      A single prior art reference that discloses every element of a claimed invention anticipates it and renders the claim invalid.  35 U.S.C. § 102 (2006); *Novo Nordisk Pharms., Inc. v. Bio-Tech. Gen. Corp.*, 424 F.3d 1347, 1354-55 (Fed. Cir. 2005).  "Although anticipation is a question of fact,

---

[3]  Today, more than four months after the Court construed the claims and over two months after Plantronics presented its expert report on infringement issues, Plantronics moved the Court for leave to withdraw these meritless accusations.  (D.N. 181, 181-1.)  Aliph will respond to Plantronics' untimely and improper motion accordingly.  As these claims remain in the case, Aliph is entitled to judgment of noninfringement and invalidity of claims 29, 35, 36, 47, and 53.

[4]  "Q.  … I'm asking you about whether you're aware of any Aliph earbud that has a stabilizer that's literally a toroid or a torus, as the Court has construed that term.  A.  I'm not aware of one."

1   it may still be decided on summary judgment if the record reveals no genuine dispute of material

2   fact." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1327 (Fed. Cir. 2001).

3        Claims 1, 7, 10, and 11, generally require: (1) a "receiver" of a certain size, (2) an "ear

4   cushion," (3) a "stabilizer," and, for some claims, (4) a "pad." Lieber discloses each of the claim

5   elements and thus anticipates the four original asserted claims.



(Ex. 3 (U.S. Patent No. 1,893,474 ("Lieber")) Figs. 1-2.)

14        In 1933, Lieber was awarded a patent on an earpiece "adapted to be held by and within the

15   ear for supporting a small telephone <u>receiver</u>." (Ex. 3, 1:1-3.) Like the '453 patent, Lieber's

16   earpiece utilizes the anatomy of the ear—including the upper concha—by having an <u>ear cushion</u>,

17   "an earpiece made entirely of soft rubber or other suitable flexible material," and a <u>stabilizer</u> with

18   "projecting part[] … 4, [that] is adapted to extend behind the crus of the helix of the ear to aid in

19   holding the earpiece in position in the ear." (*Id.* at 1:63-72, 2:30-36.) Lieber's earpiece mirrors

20   the '453 patent in that it is "connected to the receiver" while positioned to "seat on the antitragus."

21   (*Id.* at 1:72-78, 2:30-36.) The earpiece of Lieber is formed to be comfortable, with a <u>pad</u>: "[t]o

22   accomplish this purpose, [Lieber] form[s] the earpiece of … soft rubber, so that it may yield

23   somewhat and thereby adapt itself to the individual ear." (*Id.* at 1:26-30.) Lieber discloses every

24   element of the asserted claims 1, 7, 10, and 11 of the '453 patent.

25        Plantronics' expert, Mr. Kreiner, admitted to the undisputed disclosures of Lieber in his

26   deposition, disavowing the contrary but conclusory opinions in his report. (JSUF Nos. 27-28;

27   DSUF Nos. 34-41; Ex. 10, at 70:3-73:10, 82:19-87:6.) In his report, Mr. Kreiner advanced a

28   generic and unsupported conclusion that Lieber does not disclose each element, which is entitled

to no weight.  (Ex. 11, Attachment B, at 1-5.)  *See Pharmastem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1361-62 (Fed. Cir. 2007) (discounting expert's "testimony about the prior art references" that "cannot be reconciled … with the prior art references themselves").  For as Mr. Kreiner readily acknowledged at his deposition, Lieber discloses each essential element of the asserted claims:

- **receiver**:  "Q. You don't dispute that Lieber discloses a receiver which is identified in each of the first two elements of Claim 1, do you?  A. No.  It's in here, in the sketch."  (Ex. 10, at 71:10-14.)

- **ear cushion**:  "Q. [Y]ou don't dispute that Lieber discloses an ear cushion, do you?  A. No."  (*Id.* at 71:19-23.)

- **stabilizer**:  "Q. You don't dispute that Lieber discloses a stabilizer support member, do you?  A. Well, let's go through the definition of stabilizer.  There is something here that is expected to—we can call it the stabilizer."  (*Id.* at 71:24-72:8.)

- **concha stabilizer pad**:  "Q. Does [Lieber] have a conchae stabilizer pad?  A. Yeah, it would be defined that way, yes."  (*Id.* at 86:14-87:6.)

The chart below summarizes how the undisputed disclosures of Lieber satisfy every element of claims 1, 7, 10 and 11.  (*See also* Ambrose Decl., Ex. 1, Appendix C at 1-3.)

| '453 Claim Element | Lieber Disclosure |
|---|---|
| 1. An apparatus for stabilizing a headset including a receiver sized to fit between a tragus and an anti-tragus of an ear, the apparatus comprising: | Lieber discloses a "small telephone receiver," and an "earpiece" "connected to the receiver" that "when placed in the user's ear will thus seat on the antitragus."  (Ex. 3, at 1:1-3, 1:72-77, 2:30-36, Figs. 1-4.) |
| [a] an ear cushion dimensioned to cover a portion of the receiver disposed between the tragus and the anti-tragus; | Lieber discloses the claimed ear cushion as "an earpiece made entirely of soft rubber or other suitable flexible material," "connected to the receiver."  (*Id.* at 2:30-36.)  The positioning of the receiver between the tragus and anti-tragus is also disclosed in Figs. 1 and 2. |
| [b] a resilient and flexible stabilizer support member coupled to the ear cushion, and dimensioned to fit within an upper concha with the ear cushion coupled to the receiver and the receiver disposed between the tragus and the anti-tragus; and, | Lieber discloses an elongated stabilizer support member coupled to the ear cushion as "projecting part 4," which is "adapted to extend behind the crus of the helix of the ear to aid in holding the earpiece in position in the ear" and is made of "flexible material." (*Id.* at 1:60-81, Figs. 1-2.)  Figures 1 and 2 show Lieber's stabilizer as dimensioned to fit within the upper concha. |
| [c] a concha stabilizer pad coupled to the stabilizer support member, for contacting the upper concha. | Lieber discloses a concha stabilizer pad as the tip of "projecting part 4," formed of "soft rubber" and "extend[ing] behind the crus of the helix" into the |

| '453 Claim Element | Lieber Disclosure |
|---|---|
| | upper concha.  (*Id.* at 1:60-81, Fig. 1.) |
| 7. The apparatus of claim 1, wherein the ear cushion covers a portion of the receiver facing an auditory meatus as the receiver is disposed between the tragus and the anti-tragus. | Lieber discloses an ear cushion as "an earpiece made entirely of soft rubber or other suitable flexible material," "connected to the receiver" and "adapted to fit into and engage the mouth of the auditory canal." (*Id.* at 1:60-81, 2:30-36, Figs. 1-2.) |
| 10. A headset comprising: | Plantronics will be unable to show that the preamble of claim 10 is limiting.  If it is, Lieber discloses a headset, as the earpiece of Lieber is "for supporting" "a small telephone receiver, or earphone." (*Id.* at 1:1-3.) |
| [a] a receiver sized to fit between a tragus and an antitragus of an ear, the receiver having a tragus contact point, and an anti-tragus contact point disposed substantially opposite to the tragus contact point; | The "receiver" of Lieber has a tragus contact point, and an anti-tragus contact point disposed substantially opposite to the tragus contact point as the "earpiece" that is "connected to the receiver" "will thus seat on the antitragus." (*Id.* at 1:60-81, 2:30-36, Figs. 1-2.) |
| [b] an ear cushion dimensioned to cover a portion of the receiver; and | See above at claim element 1[a]. |
| [c] a concha stabilizer coupled to the ear cushion and dimensioned to contact an upper concha between an antihelix and a crux of a helix with the receiver disposed between the tragus and the antitragus. | Lieber discloses an elongated concha stabilizer coupled to the ear cushion as "projecting part 4," which is "adapted to extend behind the crus of the helix of the ear to aid in holding the earpiece in position in the ear." (*Id.* at 1:60-81.)  Figures 1 and 2 show Lieber's stabilizer as dimensioned to contact the upper concha. |
| 11. The headset of claim 10, wherein the ear cushion covers a portion of the receiver facing an auditory meatus and the concha stabilizer comprises: | Lieber discloses an ear cushion as "an earpiece made entirely of soft rubber or other suitable flexible material," "connected to the receiver" and "adapted to fit into and engage the mouth of the auditory canal." (*Id.* at 1:60-81, 2:30-36, Figs. 1-2.) |
| [a] a stabilizer support coupled to the ear cushion and extending toward the upper concha; and | Lieber discloses a stabilizer support member coupled to the ear cushion as "projecting part 4," which is "adapted to extend behind the crus of the helix of the ear to aid in holding the earpiece in position in the ear." (*Id.* at 1:60-81. Figs. 1-2.)  Figures 1 and 2 show the stabilizer extending toward the upper concha. |
| [b] a concha stabilizer pad coupled to the stabilizer support, for engaging the upper concha between the antihelix and the crux of the helix for stabilizing the receiver in the ear. | Lieber discloses a concha stabilizer pad as the tip of "projecting part 4," formed of "soft rubber" and "extend[ing] behind the crus of the helix" into the upper concha.  (*Id.* at 1:60-81, Fig. 1.) |

Lieber also discloses the elements of many of the dependent claims added in

reexamination.  The "earpiece" of Lieber is "made <u>entirely</u> of soft rubber," and anticipates new

claims 18, 21, 26, 28, and 30 that require a single piece or a single material. (Ex. 3, at 2:30-36.)

The stabilizer of Lieber, "projecting part 4" is "adapted to extend behind the crus of the helix" and

"may yield somewhat and thereby adapt itself to the individual ear." (*Id.* at 1:26-33, 1:60-81.)

This anticipates new claims 26, 28, 43, and 44, which require the stabilizer being adapted to

deform and adapt to the shape of an upper concha.  A chart summarizing how the undisputed

disclosures of Lieber satisfy every element of dependent claims 18, 20, 21, 26, 28, 30, 43 and 44 is

included in the Declaration of Stephen Ambrose.  (Ambrose Decl. ¶ 3, Ex. 1, App. C, at 3-5.)

Lieber satisfies every element of claims 1, 7, 10, 11, 18, 20, 21, 26, 28, 30, 43, and 44 as the Court

has construed them, entitling Aliph to summary judgment of anticipation.

> 2.   <u>Claims 1, 7, 10, 11, 18, 20, 21, 26, 28, 30, 43, and 44 Are Made Obvious by
> Lieber Alone, or by Komoda and Lieber.</u>

"The ultimate judgment of obviousness is a legal determination …. Where, as here, the

content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are

not in material dispute, and the obviousness of the claim is apparent in light of these factors,

summary judgment is appropriate."  *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 427 (2007)

(citations omitted).  The obviousness inquiry requires analysis of:  (1) the scope and content of the

prior art, (2) differences between the prior art and the asserted claims, and (3) the level of ordinary

skill in the pertinent art. 35 U.S.C. § 103 (2006); *Graham v. John Deere Co.*, 383 U.S. 1, 17

(1966).  Analyzing "secondary considerations" is neither required nor sufficient to overcome a

strong prima facie showing of obviousness, and is only relevant in close cases.[5]  *Graham*, 383

U.S. at 17-18; *Dow Chem. Co. v. Halliburton Oil Well Cementing Co.*, 324 U.S. 320, 330 (1945)

("[T]hese considerations are relevant only in a close case where all other proof leaves the question

of invention in doubt."); *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed.

Cir. 2007) (disregarding "substantial evidence" of secondary factors of non-obviousness "given

---

[5]  It is Plantronics' burden to rebut Aliph's *prima facie* case of obviousness.  *See Leapfrog
Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007).

1    the strength of the prima facie obviousness showing"). "Obviousness is a question of law

2    premised on underlying findings of fact." *Eolas Techs. Inc. v. Microsoft Corp.*, 399 F.3d 1325,

3    1332 (Fed. Cir. 2005).

4         *Scope and Content of the Prior Art.* It is undisputed that the scope of the prior art in this

5    field was broad by the 1990s, incorporating decades of devices from the telecommunications,

6    hearing, and audio industries. (JSUF Nos. 20-24; DSUF No. 29.) The content of the prior art

7    indisputably encompassed receivers, ear cushions for providing comfort, and numerous stabilizing

8    features dimensioned to engage the upper concha. (JSUF Nos. 20-24.) Mr. Ambrose discusses

9    the scope and content of the prior art in more detail in his report. (Ambrose Decl. Ex. 1, ¶¶ 15-23,

10   97-98.) Neither Plantronics nor its expert Mr. Kreiner has disputed the broad scope and detailed

11   content of the prior art. (Ex. 10, at 46:10-16.[6])

12        *Differences Between the Prior Art and Asserted Claims.* When analyzing the differences

13   between the prior art and the claims, "the claimed invention as a whole" is to be considered.

14   *Princeton Biochems., Inc. v. Beckman Coulter, Inc.*, 411 F.3d 1332, 1337 (Fed. Cir. 2005). The

15   claims of the '453 patent set forth no new elements or approaches to in-the-ear devices that were

16   not already known. There is no dispute that prior art since the 1920s disclosed in-the-ear devices

17   that utilized the anatomy of the ear for support and stability. (JSUF No. 20.) Plantronics admits

18   that numerous stabilizers for engaging the upper concha abounded in the prior art. (JSUF Nos. 20,

19   25; D.N. 127 at 1.) All four inventors of the '453 patent confirmed the prior existence of ear

20   cushions. (JSUF 23; Ex. 12, at 73:6-25; Ex. 13, at 56:5-56:12; Ex. 14, at 275:23-276:5; Ex. 15, at

21   162:14-20.) Plantronics' expert, Mr. Kreiner, offered no opinion on what differences, if any,

22   existed between the prior art and the asserted claims, and has not disputed that stabilizers, ear

23   cushions, and a wide variety of shapes, sizes, and materials for these devices all existed in the

24

25

---

26   [6] "Q. But you have not in your report stated an opinion about the scope and content of all the

27   prior art you considered? … A. I didn't think that was necessary to do. That would have made the
     report much, much bigger."

28

1    prior art.  (Ex. 10, at 47:3-8[7]; Ambrose Decl. Ex. 1, ¶ 98.)

2        If the claims reflect any divergence from the prior art, it is minimal.  Plantronics' counsel

3    has argued, without evidence, that the alleged difference was that in the '453 patent's claims,

4    "[t]here was a stabilizing feature, and it was coupled to the ear cushion ….  Ear cushion plus

5    stabilizer."  (Ex. 16 (9/21/11 Hrg. Tr.), at 47:19-48:15.)  While this statement is contradicted by

6    the actual prior art, even taking it as true for purposes of this motion, combining well known ear

7    cushions with well known upper concha stabilizers in a well developed field of technology was

8    obvious to the person of ordinary skill in the art.

9        *Level of Ordinary Skill in the Field.*  The Court has ruled that "a 'person of ordinary skill

10   in the art' in this field would have either (1) an engineering or design degree that covered

11   mechanical design and materials science, or (2) considerable work experience in the audio,

12   telecommunications, or hearing industries that involved researching or developing devices

13   designed to interact with the human ear."  (D.N. 142 at 3 n.2.)  Such a person would have "an

14   understanding of the specialized concepts" inherent in the art, including "design and engineering

15   problems relating to the performance, comfort, fit and stability of wired and wireless headsets …."

16   (D.N. 99 at 5.)

17       There is no dispute that an engineer with the relevant qualifications had the requisite

18   technical skills and also possessed significant ingenuity.  Plantronics' expert explained that such

19   an engineer would have received specific training in problem solving, innovative "thinking outside

20   the box," looking to see how similar challenges have been faced by others, brainstorming to arrive

21   at new solutions, and independent thinking.  (JSUF No. 26; DSUF Nos. 30-31.)  A person of

22   ordinary skill in this field would bring to bear a relatively high level of sophistication and

23   "ordinary creativity."  *KSR*, 550 U.S. at 421.  Further, it is undisputed that there are only a limited

24   number of anatomical features in the ear that any in-the-ear device can engage.  (JSUF No. 25.)

25

26       [7]  "Q. Aside from your discussion of individual prior art references in the claim charts, you
27   haven't included in your expert report an opinion about the differences between the claimed
     inventions and the prior art as a whole, have you?  A. No, I did not."
28

These include the upper and lower concha, tragus and antitragus, ear canal, and little else—constraints that greatly limit the number of solutions available to comfortably secure an in-the-ear device.  (Ex. 1, Fig. 3.)  The goal of achieving comfortable fit for in-the-ear devices was known for decades prior to the '453 patent.  (JSUF No. 21.)  The prior art disclosures, the market pressures (including the pressures to make "inconspicuous," "light-weight," "comfortable" devices[8]), and limited available solutions compel a finding of obviousness in view of the prior art discussed below.  *KSR*, 550 U.S. at 421 ("When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp.").

As discovery has revealed, Plantronics will argue that Lieber fails to disclose the required receiver "sized to fit between a tragus and an antitragus," contending that Lieber's receiver is larger than the receiver claimed in the '453 patent.  As set forth above, there is no genuine dispute that Lieber discloses every element, including the receiver "sized" as claimed.  (*Supra* at III.B.1.) But for the obviousness analysis, the point is academic because to one skilled in the art, it would have been obvious to modify the 1930s receiver of Lieber by reducing its size even further.  It is undisputed that by 1994 one of ordinary skill in the art would have been familiar with the decades-old trend towards the miniaturization of receivers for in-the-ear devices.  (JSUF No. 24.)  It was a "predictable variation" to use a smaller receiver with Lieber's stabilizing earpiece.  *Boston Scientific Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 991 (Fed. Cir. 2009) ("[i]f a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability.") (quoting *KSR*, 550 U.S. at 417).  Indeed, it would have run directly counter to basic common sense to use a bulkier receiver when a smaller one was available.  *See e.g.*, *KSR*, 550 U.S. at 420.  One of ordinary skill in the art in 1994 would have been motivated to combine a smaller receiver covered by the comfortable and stable earpiece of Lieber—this would "not require a leap of inventiveness."  *Id.*  Lieber alone makes the claims obvious.

Additionally, a smaller receiver covered by an ear cushion (and virtually all other claim

---

[8]   *See* Ambrose Decl. Ex. 1, ¶ 103 (citing U.S. Patent No. 2,763,334 ("Starkey")).

1   limitations) is disclosed in Komoda, published in 1985, which would have been obvious to

2   combine with Lieber.  Komoda, like Lieber,

3   discloses the four basic elements of the original

4   asserted claims.  Depicted below, Komoda

5   discloses a <u>receiver</u> sized to fit between a tragus

6   and antitragus, which it calls the "accommodation

7   case of the body of the earphone unit [1]."  (JSUF

8   Nos. 31-32; Ex. 4, at § 2.)  Komoda discloses an



9   <u>ear cushion</u> dimensioned to cover a portion of the receiver, described as a "cover body 2 made of

10  leather, sponge, etc., having a soft touch."  (JSUF Nos. 33-34; Ex. 4, at § 3.)  Komoda discloses a

11  <u>stabilizer</u> dimensioned to engage the upper concha:  a "hook component 4" "sandwich[ed] …

12  between the crus of the helix 6 and the crus of the antihelix 11 …."  (DSUF Nos. 43-44; Ex. 4, at §

13  3.)  And Komoda discloses a "concha stabilizer <u>pad</u>" at the end of the stabilizer as a "distal hook

14  part 4a" made of a suitably "flexible" material.  (DSUF No. 45; Ex. 4, at § 3.)  Thus, while each of

15  claims 1, 7, 10, 11, 18, 20, 21, 26, 28, 30, 43 and 44 is anticipated by Lieber, each claim also is

16  made obvious over Komoda and Lieber.

17      Komoda's receiver could readily be combined with the rubber earpiece disclosed by

18  Lieber.  (Ambrose Decl. Ex. 1, App. D, at, e.g., 52-53.)  Komoda discloses a receiver sized to fit

19  between the tragus and the antitragus that sits in the ear and is covered by an ear cushion.  (JSUF

20  Nos. 34, 37.)  To the ordinarily skilled artisan, motivated by a desire for better aesthetics and

21  comfort, and familiar with the miniaturization of receivers, it would have been obvious to use a

22  smaller in-the-ear receiver like that disclosed by Komoda with the stabilizing and cushioning

23  earpiece disclosed by Lieber.  *See KSR*, 550 U.S. at 421 ("A person of ordinary skill is also a

24  person of ordinary creativity, not an automaton.") (Ambrose Decl. Ex. 1, App. D, at, e.g., 52-53.)

25  This combination of features would have required only basic common sense.  *Dystar Textilfarben*

26  *GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1368 (Fed. Cir. 2006) (holding

27  that evaluating obviousness "*requires*, consideration of common knowledge and common sense")

28  (emphasis in original).  At a minimum, such a combination would have been "obvious to try."

1   *KSR*, 550 U.S. at 421 (holding that when "there are a finite number of identified, predictable

2   solutions" that are "obvious to try" the result is likely not innovation but ordinary skill).  With no

3   dispute over the underlying facts, Aliph is entitled to judgment as a matter of law of the

4   obviousness of claims 1, 7, 10, 11, 18, 20, 21, 26, 28, 30, 43, and 44 over Lieber alone or Komoda

5   with Lieber.

6              3.     All of the Asserted Claims Are Made Obvious by Komoda, Lieber, and
                      Geers.
7

8          The new dependent claims 25, 29, 31-42, and 45-56 that relate to concha stabilizers that

9   are "ring shaped" or "torus shaped" or have an "opening" or "vacant center" are made obvious by

10  Lieber and Komoda, in combination with Geers.  As discussed above, Lieber anticipates and

11  makes obvious many of the claims and renders them obvious alone and in view of Komoda.

12  Geers further discloses "hoop-like support elements 5" that are roughly ring or torus shaped and

13  have an opening or vacant center.  (JSUF No. 29; DSUF No. 42; Ambrose Decl. Ex. 1, App. D, at

14  6-8; Ex. 5, at 2:39-43.)

15         In view of the circular support elements disclosed in Geers,

16  depicted here, one of ordinary skill in the art would have found it

17  obvious to combine these with the familiar stabilizing structures in

18  Lieber and Komoda that engage the upper concha, as claimed in

19  claims 25, 29, 31-42 and 45-56 of the '453 patent.  (Ambrose Decl.

20  Ex. 1, App. D, at, e.g., 6-8.)  The stabilizers disclosed in Lieber and

21  Komoda serve the same function as the "hoop-like support elements"



22  disclosed as extending from the "transmitter housing" for the device in Geers.  All function to

23  stabilize the device; they are familiar elements serving known purposes.  (*See* Ambrose Decl. Ex.

24  1, App. D, at, e.g., 6-8.)  *Sundance, Inc. v DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1366-67

25  (Fed. Cir. 2008) ("[A] combination is more likely to be obvious where it 'simply arranges old

26  elements with each performing the same function it had been known to perform.'") (citations

27  omitted).

28         Combining Geers's hoop-like supports with the in-the-ear devices of Lieber and Komoda

was not just common sense, but was explicitly encouraged in the field.  For example, U.S. Patent

No. 2,763,334 ("Starkey") provides an express motivation to use stabilizers with open shapes

because they help make earpieces "inconspicuous," "light-weight," "extremely comfortable," and

"cooler to wear in hot weather."  (Ex. 17, at 1:44-60; Ambrose Decl. Ex. 1, e.g., ¶ 103; JSUF No.

46.)  Hollowing out the centers of stabilizing features was common practice to those in the field

for exactly the reason that it reduced the visibility, weight, and heat of earpieces.  (Ambrose Decl.

Ex. 1, App. D, at, e.g., 6-8.)  These advantages would have made it obvious to combine the

stabilizers of Lieber and Komoda with the "hoop-like support elements" of Geers.  *Id.*  Moreover,

the skilled artisan combining these features would have had a reasonable expectation of success.

As Plantronics' Director of Intellectual Property testified, "the goal of the device" of the '453

patent was "improved stability," and achieving this goal was no surprise, but an expected result.

(Ex. 18, at 143:15-25.)  Mr. Ambrose confirms that artisans in the field at the time regularly and

successfully hollowed out stabilizing features—a point not rebutted by Plantronics' expert, Mr.

Kreiner.  (Ambrose Decl. Ex. 1, e.g., ¶¶ 102-103, App. D, at 6-8.)  When the combination of

known functions "leads to the anticipated success, it is likely the product not of innovation but of

ordinary skill and common sense." *KSR*, 550 U.S. at 421.

Plantronics cannot create a genuine dispute over the underlying facts that compel the legal

conclusion of obviousness.  Mr. Ambrose explains in his report the disclosures of ring and torus

shaped stabilizers in Geers and the motivations that drove artisans to use such open shapes for in-

ear stabilizing devices.  (Ambrose Decl. Ex. 1, App. D, at 6-8.)  Plantronics and its expert do not

meaningfully dispute the teachings of the prior art or the skilled artisan's ability and motivation to

adjust or combine them.  Mr. Kreiner merely repeats a generic three-sentence mantra, 25 times in

his report, challenging the ultimate legal determination of obviousness.  (Ex. 10, at 96:24-98:12[9];

Ex 11, Attachment C, at, e.g., 2-3, 5, 13-14, 17, 24-26, 29, 36-38, 41-42, 49-52, 55-56, 64-67, 69.)

---

[9]  "Q.  Now, this paragraph about obviousness … that's repeated verbatim 25 times in your claim charts in Attachment C, isn't it?  A.  It's repeated a number of times; you're correct.  Q. And every time it's repeated, it fails to identify any particular prior art reference, correct?  A. Well, it wasn't necessary."  (Ex. 10, at 98:2-12.)

1    In this refrain, Mr. Kreiner analyzes <u>no</u> particular prior art references, fails to refute the disclosures

2    in the prior art, never discusses the motivations of skilled artisans in the field, and does not address

3    the specific "stabilizer" element at issue.  (Ex. 10, at 96:24-98:12, 158:23-159:16, 185:18-186:5,

4    194:22-196:11[10]; Ex. 11, Attachment C, at, e.g., 5.)  An expert report that "leav[es] only a

5    conclusory record to oppose summary judgment of obviousness" does not create a genuine issue

6    of material fact.  *Adv. Tech. Material, Inc. v. Praxair, Inc.*, 228 Fed. Appx. 983, 985 (Fed. Cir.

7    2007); *Union Carbide Corp. v. Am. Can Co.*, 724 F.2d 1567, 1572 (Fed. Cir. 1984) (finding

8    "unsupported conclusory [expert] opinion" insufficient to raise a genuine issue of material fact).

9    Because the underlying facts are undisputed and the ultimate decision on obviousness is a matter

10   of law, *KSR*, 550 U.S. at 427, the Court should grant summary judgment of obviousness of all of

11   the asserted claims.

12          C.      <u>Aliph Is Entitled to Partial Summary Judgment of No Liability Before the</u>
                    <u>Reexamination Certificate Issued.</u>

13

14          Plantronics accuses Aliph of infringing as early as 2008.  (JSUF No. 47.).  In 2008, the

15   only asserted claims that existed were original claims, 1, 7, 10 and 11.  For the reasons described

16   above, those claims are invalid.  *Supra*, Sections III.B.1, III.B.2).  Plantronics also claims Aliph

17   infringes new claims 18, 20-21, 25-26, and 28-56 (JSUF No. 53), but those claims were added just

18   last year in reexamination. (JSUF No. 51.)   One cannot infringe a claim before it exists.

19          The Patent Act protects a defendant from liability for infringing a claim added during

20   reexamination before the reexamination concludes, unless the accused conduct infringed an

21   original, valid claim.  35 U.S.C. §§ 307(b), 252 (2006); *Bloom Eng'g, Co., Inc. v. North Am. Mfg.*

22   *Co., Inc.*, 129 F.3d 1247, 1250 (Fed. Cir. 1997) (affirming judgment of no liability prior to

23   reexamination certificate).  On November 9, 2009, while this case was pending, Aliph requested,

---

24

25    [10]  "Q.  In the 'hodgepodge' paragraph you've concluded that these prior art references
      represent drastically different solutions to the problem of retaining a receiver in the ear, but you've
26    not explained the differences in the solutions that are shown in these prior art references, correct?
      A.  I didn't think it was necessary.  I think the patents and claims speak for themselves.  Q.  So
27    you haven't done it in your report, correct?  A.  You have the report.  I obviously haven't done it."
      (Ex. 10, at 185:18-186:5.)

28

1  and the Patent Office granted, a reexamination of claims 1, 7, 10 and 11 of the '453 patent.  (JSUF

2  No. 48.)  During the proceeding, Plantronics added new claims 16-56.  (JSUF No. 50; Ex. 2 at

3  1:18-2:65.)  The new claims did not merely clarify the original claims, but rather added limitations

4  that were not in the original claims.  (JSUF No. 52.)  Not one of the new claims is identical to any

5  original claim of the '453 patent.  (JSUF No. 52; Ex. 1; Ex. 2; DSUF 49.)  The reexamination

6  certificate issued on March 1, 2011.  (Ex. 2.)

7            "Unless a claim granted or confirmed upon reexamination is identical to an original

8  claim"—and here, there is no genuine dispute that the new and original claims are <u>not</u> identical—

9  "the patent cannot be enforced against infringing activity that occurred before issuance of the

10  reexamination certificate."  *Bloom Eng'g*, 129 F.3d at 1250; *Univ. of Va. Patent Found. v. General*

11  *Elec. Co.*, 755 F. Supp. 2d 709, 735 (W.D. Va. 2010).  Accordingly, no claim by Plantronics that

12  Aliph infringed the new claims <u>before</u> the reexamination certificate issued can survive.[11]  Aliph is

13  entitled to summary judgment of no liability for infringing, before March 1, 2011, any claim

14  added during the reexamination.

15  IV.     <u>CONCLUSION</u>

16            For all the foregoing reasons, Aliph is entitled to (1) summary judgment of non-

17  infringement; (2) summary judgment of invalidity of the '453 patent over the prior art; and

18  (3) partial summary judgment of no liability prior to the issuance of the reexamination certificate.

19

20

21

22

23

24

25

26        [11]    Aliph addresses here only liability for its conduct predating the reexamination certificate;
27  Aliph does not now seek a ruling under the doctrine of intervening rights, which precludes liability
   for certain post-reexamination conduct.  Aliph reserves all rights with respect to intervening rights.
28

1   DATED:  February 15, 2012        QUINN EMANUEL URQUHART &
                                     SULLIVAN, LLP
2

3

4                                    By  /s/ Gabriel S. Gross
                                        Robert P. Feldman
5                                       Gabriel S. Gross
                                        Michelle G. Lee
6                                       Dane W. Reinstedt
                                        Attorneys for Defendants
7                                       ALIPH, INC., and ALIPHCOM, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28