IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLANTRONICS, INC.,<br><br>    Plaintiff,<br><br>  v.<br><br>ALIPH, INC., et al.,<br><br>    Defendants.<br>                                            / | No. C 09-01714 WHA<br><br>**ORDER REGARDING DEFENDANTS'<br>MOTION TO STRIKE DAMAGES<br>EXPERT STUDIES OF MATTHEW<br>LYNDE AND BRIAN NAPPER** |

**INTRODUCTION**

In this patent-infringement action, defendants move *in limine* to exclude plaintiff's damages study and testimony from two experts. For the reasons stated below, the motion is largely **DENIED**.

**STATEMENT**

On remand from our court of appeals, this action was reassigned to the undersigned judge, two case management conferences were held, and after full briefing and oral argument, a January 10 order resolved Plantronics' motion to exclude the damages study and testimony of Dr. Gregory K. Leonard (Dkt. No. 326). The same day, Aliph moved to strike the damages study and testimony of Dr. Matthew R. Lynde (lost profits) and Mr. Brian W. Napper (reasonable royalty) for inadequate apportionment analysis. This order follows full briefing and oral argument held on February 19. The jury trial is set to begin March 6.

**ANALYSIS**

Both sides compete in manufacturing and selling bluetooth headsets. The asserted patent discloses a "concha stabilizer," also called an earbud, to support a headset staying in the ear. The accused products are earbuds sold separately or in combination with Aliph's headsets. The

1 earbuds are detachable from the headset, come in various sizes (*e.g.*, small, medium, large, and
2 extra-large), and are often sold in bundles with the bluetooth headsets or separately as spare or
3 replacement parts. In 2008, according to Plantronics, in an act of desperation to meet customer
4 complaints, Aliph initially provided customers more than 42,000 units of a beta version of the
5 accused earbuds for free. This was after Aliph allegedly received complaints, returns, and
6 recognized a "fit issue" with its headsets. To be clear, the asserted patent does *not* cover most
7 aspects of Aliph's headsets, and the parties do not so contend. Both Plantronics' and Aliph's
8 headsets contain software and hardware components, including bluetooth technology, speakers,
9 and noise-cancellation features.

10 Aliph styled this motion as an "apportionment" attack, but upon closer review and oral
11 argument, it proves otherwise. This order allows Matthew Lynde and Brian Napper to provide
12 their opinions and testimony to the jury, subject to the conditions identified herein.

13 **1.    MATTHEW R. LYNDE (LOST PROFITS).**

14 Given the dispute presented in the parties' papers and at oral argument, this order briefly
15 canvasses the Federal Circuit's decisions on the subject of lost profits. "To get lost profits as
16 actual damages, the patent owner must demonstrate that there was a reasonable probability that,
17 but for the infringement, it would have made the infringer's sales." *State Indus., Inc. v. Mor-Flo*
18 *Indus., Inc.*, 883 F.2d 1573, 1577 (Fed. Cir. 1989). "The 'but for' inquiry therefore requires a
19 reconstruction of the market, as it would have developed absent the infringing product, to
20 determine what the patentee" would have made. *Grain Processing Corp. v. Am. Maize-Products*
21 *Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999). "To prevent the hypothetical from lapsing into pure
22 speculation, [the] court requires sound economic proof of the nature of the market and likely
23 outcomes with infringement factored out of the economic picture." *Ibid*. The Federal Circuit has
24 stated that a useful, but non-exclusive, way for a patentee to prove entitlement to lost profits is the
25 *Panduit* four-factor test:

26 > The *Panduit* test requires that a patentee establish: (1) demand for
> the patented product; (2) absence of acceptable non-infringing
27 > substitutes; (3) manufacturing and marketing capability to exploit
> the demand; and (4) the amount of the profit it would have made.
28

2

*Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978)).  Significantly, the Federal Circuit has not blessed one particular methodology as supreme, but instead permitted experts to proffer a variety of theories and evidence in support of their opinions.  *Grain Processing*, 185 F.3d at 1350 (collecting decisions).  A wide variety of reconstruction theories have been affirmed where the patentee has presented reliable economic evidence of "but for" causation.  *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1355 (Fed. Cir. 2001).

Aliph leads its attack by imposing on Dr. Lynde, Plantronics' lost profits expert, a duty to apportion consumer demand for the allegedly infringing features by citing to reasonable royalty decisions.  This supposed duty that Aliph wants under the first *Panduit* factor is not required by Federal Circuit decisions:

> The *Panduit* factors do not require showing demand for a particular embodiment of the patented functionality . . . .  Nor does it require any allocation of consumer demand among the various limitations recited in a patent claim.

*Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1265 (Fed. Cir. 2013), cert. denied, No. 13-716, 2014 WL 210681 (2014) (internal citations omitted).  "Instead, the first *Panduit* factor simply asks whether demand existed for the 'patented product,' *i.e.*, a product that is 'covered by the patent in suit' or that 'directly competes with the infringing device.'"  *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1330 (Fed. Cir. 2009).  There is ample evidence from which a jury could reasonably conclude that there was and is demand for the patented part of the goods in question, the earbud using the claimed design.

That Aliph can point to deposition testimony that identifies other drivers of demand for the overall bluetooth headsets like audio performance, ability to suppress wind noise, and noise-cancellation technology is of little moment.  This is fodder for cross-examination.  Reasonable experts can disagree about the driver of demand for overall bluetooth headsets, but the bottom of it is that the first *Panduit* factor as construed by the Federal Circuit does not require more than demand for the patented product, *i.e.*, the earbud part.

Dr. Lynde defined the relevant market for the accused products as premium monaural bluetooth mobile headsets with some form of noise-cancellation or suppression technology. This is because both sides compete in this multi-competitor marketplace. Indeed, the experts from both sides refer to the headset or bluetooth headset market, rather than any "earbud" market (*See, e.g.*, Leonard Rep. 3, 6–9, 18–19; Lynde Rep. 7–10; Napper Rep. 6–10). Dr. Gregory Leonard (Aliph's expert) and Dr. Lynde rely on market data provided by the NPD Group which tracks bluetooth headset retail sales (Leonard Rep. 18, Lynde Rep. 9).

Is this proper? That is, is it proper to leverage the small earbud item to reach sales of the vastly more expensive bluetooth mobile headset? Upon a proper showing, the answer is yes under the law of the Federal Circuit where lost profits are concerned. The Federal Circuit has recognized that upon a proper showing, lost profits may be recovered for convoyed sales:

> A "convoyed sale" refers to the relationship between the sale of a patented product and a functionally associated non-patented product. A patentee may recover lost profits on unpatented components sold with a patented item, a convoyed sale, if both the patented and unpatented products together were considered to be components of a single assembly or parts of a complete machine, or they together constituted a functional unit. Our precedent has not extended liability to include items that have essentially no functional relationship to the patented invention and that may have been sold with an infringing device only as a matter of convenience or business advantage.

*Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008) (internal citations and quotations omitted). *See also Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1373 (Fed. Cir. 2010) (per curiam). The test is whether the allegedly infringing component and other components constitute a functional unit or hold an interrelated relationship such that they are parts of a complete machine. *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1550 (Fed. Cir. 1995). Inextricably intertwined components functioning together can support recognizing the single unit. *Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1361 (Fed. Cir. 2001). Here, even though earbuds can be purchased separately as spare or replacement parts, it would be reasonable for a jury to find that an earbud alone without the bluetooth device is of little to no use to a consumer. The earbud is a plastic or foam attachment that allows the bluetooth device to stay in the ear. This is not to say that the jury cannot find that Plantronics' expert inflated his findings. That shall be within the province of our jury. It is just to

4

1  say that at this point, this order will not bar Dr. Lynde's opinions altogether from being offered to
2  the jury.  A reasonable jury could find that the test for convoyed sales has been met.  Dr. Lynde's
3  opinions may be presented at trial to the jury and Aliph will have the opportunity to raise
4  admissible competing evidence and to cross-examine Dr. Lynde.

5  Aliph argues that the accused earbuds had little to no effect on Aliph's sales, return rates,
6  and market share; that Aliph's customers may have had different reasons for choosing to purchase
7  Aliph's products; and that there were acceptable non-infringing substitutes.  These are the sorts of
8  arguments to be proffered via admissible evidence at trial and for the jury to weigh the competing
9  evidence.  It would be wrong for this order to usurp that role.

10  After arguing for a supposed need to apportion consumer demand under the first *Panduit*
11  factor, Aliph's next challenge is to the second *Panduit* factor.  Contrary to Aliph, Dr. Lynde did
12  not state that no acceptable non-infringing substitutes existed.  What Dr. Lynde did say was that
13  for at least a *portion* of Aliph's sales, there was no acceptable non-infringing substitute.  He based
14  this opinion on the lack of design-around options, Plantronics' and Aliph's sales trends, and that
15  Aliph switched to the accused earbuds to address "fit problems," product returns, and complaints.
16  To estimate the appropriate portion, he focused on three of Plantronics' products which allegedly
17  practice the asserted patent.

18  Aliph argues that even though Dr. Lynde identified a long menu of fifty-six competing
19  premium headsets with some degree of substitutability with the accused headsets, he failed to
20  properly consider these when analyzing the second *Panduit* factor.  This order agrees that Dr.
21  Lynde's analysis is sparse on this point.  He will be restricted at trial to the four-corners of his
22  report and perhaps Aliph will proffer competing evidence that there *were* acceptable non-
23  infringing alternatives.  That said, Dr. Lynde's findings herein are not so unsupportable that it
24  would be unfair or unhelpful to allow him to testify before our jury.

25  Aliph also argues that Dr. Lynde opined that all of Aliph's relevant sales would have
26  flowed to Plantronics.  Not exactly.  What Dr. Lynde did was reconstruct the market to remove
27  Aliph's infringing sales and reallocate those sales to the remaining competitors.  After such
28  reconstruction, he found that Plantronics would hold approximately 17% of the market share for

the relevant period. He found that Plantronics had the manufacturing and marketing capacity via its own facilities and third-party suppliers to take on the lost units. He found that Plantronics would have won its share of Aliph's infringing sales.

In *Versata*, the Federal Circuit affirmed the jury's award of lost profits. 717 F.3d at 1267. The expert identified a pool of potential customers for the accused software and counted defendant's infringing sales during the relevant period. Then, the expert used plaintiff's historical customer win-rate to calculate the customers plaintiff would have won but for defendant's infringement. The expert went on to discount the customer pool because plaintiff would not likely resume making sales at the same pace as historical rates and the expert isolated the value of each lost sale. He differentiated between sales with the licensed technology and general sales. The pool of lost sales was then multiplied by the amount lost per sale to result in lost profits. *Id*. at 1265–67.

In much the same fashion, Dr. Lynde started by calculating the sales Plantronics would have made but for Aliph's infringing sales and then calculated the incremental profit that Plantronics would have made on those lost sales. As shown in Schedule 1, Dr. Lynde took Aliph's gross headset unit sales for a specified time period and multiplied that by Plantronics' market share for its three headsets to find Plantronics' lost headset sales. For example, if Aliph sold 100 headsets in November 2008 and Plantronics' market share for its three headsets was 15% at that time, then Dr. Lynde opined that Plantronics' lost headset sales was 15 units. Dr. Lynde then multiplied the lost sales by the blended net average sales price for the three headsets to find the total lost revenue for that time period. For example, if the blended net average sales price for November 2008 was $50, he multiplied that number by 15 to find $750 in lost revenue. To calculate incremental profit, Dr. Lynde looked at the incremental profit margins for Plantronics' three products and multiplied that number with the lost revenue to arrive at lost profits. If the incremental profit margin was 30%, he opined that the lost profits was $225.

Aliph relies on *Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Systems, LLC*, 350 F.3d 1327, 1346 (Fed. Cir. 2003), an entire market value rule decision, wherein the Federal Circuit vacated a lost profits award based on clearly erroneous fact findings. But there,

6

the district court erred in basing lost profits on a product with features from the asserted patent and other patented features when there was another product which only embodied the features of the asserted patent. This is not the case here. Both sides sell headsets with bluetooth technology and noise-suppression features. In that way, Dr. Lynde has focused his opinion on vastly similar competing products. That is, Aliph's gross headset unit sales and Plantronics' headset market share.

This order finds *Crystal Semiconductor* more persuasive, wherein the Federal Circuit ordered lost profits and reasonable royalties. 246 F.3d at 1362. The patentee's expert sought lost profits based on its market share. The expert divided the audio chip market into two segments: low quality and high quality. The expert calculated the patentee's market share for each year of infringement and looked at standard market sources. He then removed the accused infringer's sales and asked for an award based on the average market share. Even though the district court eliminated the jury's lost profits award, the Federal Circuit found sufficient evidence to support the jury's 35% lost profits award. *Id*. at 1352–1357. Here too, Dr. Lynde's market reconstruction theory is not so fundamentally flawed that a jury cannot hear his opinions. Whether the jury accepts them is an entire other matter of course. Indeed, Plantronics still has the burden of proving entitlement to lost profits. But at the end of the day, "[d]eciding how much to award as damages is not an exact science, and the methodology of assessing and computing damages is committed to the sound discretion of the district court." *Mor-Flo*, 883 F.2d at 1576-77. This order declines to strike Dr. Lynde's report and testimony.

   **2.   BRIAN NAPPER (REASONABLE ROYALTY).**

Although Aliph takes great offense to Mr. Napper's short analysis under *Georgia-Pacific* factor thirteen — the portion of realizable profit that should have been credited to the invention as distinguished from non-patented elements — it is overkill to strike Mr. Napper altogether when his testimony could be helpful on other points raised in his report. *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). The list of factors relevant to determining the amount of a reasonable royalty for a patent license identified in *Georgia-Pacific* is not a rigid test. Different experts give different factors varying weight, sometimes no weight to

7

one or more factors. If Aliph could strike an expert report because one paragraph under one factor was not completely developed, then few experts would survive to trial.

Mr. Napper's analysis under factor one, for example, wherein he looked at allegedly comparable licenses and an offer by Plantronics regarding the asserted patent would clearly be of potential aid to our jury.

Counsel for Aliph harps on apportionment but the key point is that Mr. Napper has already apportioned to the smallest salable patent-practicing unit, *i.e.*, the accused earbud, where possible. Plantronics points to Mr. Napper's analysis of the Motorola Development and Supply Agreement wherein Plantronics agreed to manufacture earbuds incorporating the asserted patent. Mr. Napper is permitted to testify on this agreement because the agreement concerns earbuds and he backed out the unit cost and O-ring cost. He reduced the $2.22 and $2.48 per unit gross margins to $0.40 and $1.70. Thus, Mr. Napper may reference these numbers but *must* expressly acknowledge that these numbers include more than just a reasonable royalty, *i.e.*, labor and profit.

Similarly, Mr. Napper and Plantronics may offer the $0.25 per unit Primax offer from Plantronics to Primax to license the asserted patent and $0.25 per unit Freebit license between Aliph and Freebit AS because these are the only allegedly comparable licenses. Indeed, both sides' experts address these licenses as the "next best" evidence because Plantronics has never entered into a per earbud license for the asserted patent. Instead, the Primax offer (which was never consummated) and the Freebit license for an allegedly comparable technology are per headset licenses, which Plantronics argues is the industry practice. In such spirit, the parties shall be permitted to proffer the Primax offer and the Freebit license discussed in both sides' expert reports. It would be patently unfair for Aliph to strike Mr. Napper's report for failure to apportion because he relied on these headset licenses when Aliph's expert relies on the very same licenses.

Aliph's second and third reasons for striking Mr. Napper's report are that he failed to account for Aliph's alternative options in a hypothetical world and provided insufficient quantitative analysis to support his $1.00 per unit opinion. In his opinion, the royalty would be made on each accused infringing unit, which includes standalone earbuds sold separately and earbuds sold in combination with headsets. This order declines to strike Mr. Napper on these

8

grounds. Mr. Napper proffered some support for finding alternatives inferior. He found that Aliph was motivated to solve its fit problems because of complaints and return rates and the patented, follow-on accused earbuds had superior fit and performance. Moreover, that in several sentences in the report Mr. Napper did not specifically quantify the "upward" or "downward" influence various factors had on his reasonable royalty opinion can be explored on cross-examination. For example, here are three statements Aliph identifies: (1) "Plantronics's [sic] $0.25 license with Primax tended to be lower than it would have been for other potential licensees who may not have had as strong a relationship with Plantronics," (2) "Had the patent not been under reexamination, the royalty rate made to Plantronics 'would have been higher,'" and (3) "Overall, the established profitability of the product made under the patent has an upward influence on the royalty payment in this matter" (Reply 15). These are good cross-examination points.

This order notes that a companion order addresses the limitations to Mr. Napper's testimony regarding the Primax offer. The short of that ruling is that, he may not reference the alleged "veto provision" because Plantronics stonewalled in discovery by abusing its privilege assertions.

In sum, this judge has seen many reasonable royalty studies and is convinced that it would assist the jury to lay before it the allegedly comparable licenses in the Primax, Freebit, and Motorola transactions. It is true that none is a perfect fit but they are close enough to consider and to then make adjustments for the differences. Mr. Napper should concentrate on making this comparison. For purposes of a reasonable royalty, he need not and should not veer off into overall sales revenues on the electronic parts of the overall units. He should stick to the earbud.

Since this order allows Dr. Lynde to testify as to lost profits, the Court is now aware that in that context, gross sales by Aliph — in terms of accused units — will be placed before the jury. But the undersigned judge sees, even in that context, no need to get into the degree of profitability of the overall units or the total sales revenue — without advance permission from the Court.

**IT IS SO ORDERED.**

Dated: February 21, 2014.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

9